May it please the Court, my name is Eitan Kasteljanich. I'm representing Michelle Hurter in this appeal. This case goes way back. Hurter applied for SSI disability benefits back in June of 2006, so it's been more than 11 years. Her claim was first denied by an ALJ in October of 2008. The case was appealed to district court. The district court remanded, but the remand had a very limited scope. It was remanded only to reconsider step five, so everything else was pretty much affirmed. We appealed that to this court and this court affirmed the district court. So then it was sent back for the new hearing. Two new hearings were scheduled. Well, it's a little confusing the record. There were three, but the first one, the ALJ on his own, canceled it because the case was still pending at the Ninth Circuit. So then there were two additional hearings that he scheduled. These hearings were scheduled in Seattle. Now, Hurter lives in Pierce County. The hearing office in Tacoma. But by mistake, Social Security never transferred her case there. So the hearing was in Seattle and her attorney, her hearing attorney, which was not me, appeared at the hearing and asked, why isn't this in Tacoma? And the ALJ said, I'm not transferring this to Tacoma, so I'll reschedule it for you and she's got to get here. So about a month later, there was the new hearing. She didn't make it. And as near as we can tell from the record, because it's not clear, it was because her ride had fallen through. So she didn't have transportation to go the further distance to get there. The attorney asked for another hearing and the ALJ said no. Now, Social Security actually has a procedure where they can allow people to appear by telephone if necessary, but the ALJ chose not to allow that and chose not to allow a new hearing. So there's a lot of procedural messiness here, but let me focus on what I think the biggest error is requiring remand. The ALJ knew that basically his previous decision had been affirmed right up through Step 5. It was reversed at Step 5 because he hadn't taken vocational expert testimony, which was clearly required. So in his new decision, it's okay for him to adopt his prior residual functional capacity assessment for the time period through his last decision, because that had been affirmed. The problem is he also adopted that exact same residual functional capacity assessment for the four years that had elapsed between his last decision and the new decision. And there was new evidence. There was about 370 pages of new evidence that had been submitted. And included in that evidence was evidence from a physician assistant, Ms. Nemitz, who opined that Herter was severely limited, not even able to do sedentary work. And she based this in part on the fact that this woman's got a lot of things wrong with her. But also one of the particular findings she noted was that she had very severely reduced range of motion in one of her shoulders. So there's that new evidence. There was a psychological evaluation. Now, there was a, previously there had been a treating physician who had opined that basically she had a lot of problems wrong with her, but her psychological condition was a real mess. And that had been rejected by the ALJ because she wasn't a psychiatrist. Supposedly she was biased because she was her treating physician. Well, that was affirmed by the district court and affirmed by this court because, once again, there was no psychological or psychiatric evaluation. Well, in the new record, there's a psychological evaluation by Dr. Wingate. And Dr. Wingate opined that she had lots of marked and moderate, which is defined as significant, lots of limitations. The ALJ rejected it. There was a treating physician, a Dr. Enkema, who saw her a few times and filled out a form in which he evaluated her and said she was limited, he thought she was limited to sedentary work. Now, that's significant here because throughout the time frame from the, that we're looking at here, and as far as our case is concerned, I'm not challenging the ALJ's finding for the time period through his previous decision because that had been affirmed. But for the time period beginning in 2008, if she was limited to sedentary work, she's disabled under Social Security's rules, under the medical vocational guidelines, she is disabled. But the ALJ rejected Ms. Nimitz's opinion that she was severely limited, rejected Dr. Enkema's opinion that she was limited to sedentary work, rejected Dr. Wingate's opinion that she had many marked functional limitations, mental functional limitations, and in fact said that she had no mental, severe mental impairment whatsoever. That was the ALJ's finding here. So... Was there another Dr. Palaskis? Yes, I haven't even gotten... Dr. Palaskis was a specialist who treated her for Meniere's disease, which is a disease that affected her balance. And it's an intermittent problem. And this was something she was having throughout this time. And Dr. Palaskis confirmed that. Now the ALJ rejected Dr. Palaskis's opinion in part, or if... well, actually I think this is his main reason, was he claimed, the ALJ claimed that Dr. Palaskis stated this opinion without having even seen her. But he had seen her in 2009, and then he actually saw her in 2012, examined her, and then several months later completed, wrote a letter explaining his opinion. Now his opinion isn't so much of a disabling opinion as it's an opinion that yes, she has Meniere's disease, yes, this can cause these exacerbations that can affect her balance. So that by itself, I'm not so sure that that... well, actually, depending on how often they occur, that could limit you to sedentary work, where you wouldn't want to be working on your feet if you're going to lose your balance. But it doesn't stand alone. We've got the other evidence as well, all of which was rejected by the ALJ. Now so confirm to me or explain to me why the ALJ rejected Dr. Enkema's opinion. He thought that he described, the ALJ described it, well for one thing, he called Dr. Enkema an examiner, and he's not. He was a treating physician at that time, because her previous treating physician had retired. And he said that, well, he only, he estimated that it would only, he wanted her to be re-evaluated in three weeks. He didn't really give a long length, like he didn't say, I think she's limited to sedentary and this is permanent, or this is for 12 months. He didn't, he was nonspecific about the length of time. So once again, Dr. Enkema's by itself might not support, unquestionably support disability, but it's consistent with Ms. Nemitz's opinion. It's consistent with the earlier evidence from the, all of which was rejected by the ALJ as well, that was affirmed by two courts. Excuse me, you said Dr. Enkema was a treating physician, but didn't he check off or say he was an examining physician on the form? Well, he examined her, but he had actually, because he treated her more than once, under Social Security regulations, that's a treating physician, because he was actually treating her. I know, but he described himself as an examining physician. Honestly, I don't think that even affects the analysis here, because even if he, even if we were to assume he's only an examining physician, his opinion is still entitled to wait and it's consistent with all of the other evidence from every treating and examining physician, that she has a plethora of problems, including there's evidence in the record, in the new record, of an x-ray on her foot that confirmed that she has a congenital deformity on her foot. She has these short toes, and that affects her balance as well, affects her ability to walk. Ms. Nemitz talked about her having a very slow gait, so it wasn't just her shoulder. And once again, even if we assume that the ALJ didn't have to accept Ms. Nemitz's opinion that she was severely limited, her findings would support a limitation to sedentary. Now, one of the problems with the rejection of Ms. Nemitz's opinion is the ALJ looked on it, Ms. Nemitz accidentally wrote January 2008 on the form, when in fact Ms. Nemitz had, it's obvious, and the district court agreed on its review that it's obvious, it was actually from January 2009. There's a treatment note from the same date that confirms that. The form was sent to her in October of 2008. But the ALJ didn't look that carefully at it, and he believed it was from, he rejected it in part because he thought it was from a year earlier than it was. So, all of this then dovetails with the treatment of her testimony. Well, there wasn't new testimony, but he still needed to evaluate her testimony in light of all of the new evidence, which he did not do. He just repeated, there's no change in his residual functional capacity from his prior decision to the current decision. One of the odd things from this case is there's a finding that he rejected her testimony in part because she told someone, what are your goals right now? And her goals were horseback riding and obtaining disability. Well, when she was younger, she used to ride a horse. She hasn't ridden one in decades. But that was one of her goals in her life. She hoped she could someday get on a horse again. Her desire to obtain disability is a natural desire if you're broke and you can't work. She hasn't worked. It's pointed out by Ms. Nimitz that she hasn't worked in 16 years. She's had all these problems that affected her ability to work for many years. Yes, somebody in that situation is going to seek disability. That's not a reason to reject her testimony. I don't have anything else, so I'd like to... Was Dr. Ekema part of a clinic? Was he part of a group clinic? Yes, he was part of a group clinic. And that's why he was seeing her as part of that group clinic. He wasn't... Which other doctors were part of that same clinic? There's, I'd have to sit down and look it up to tell you that. I'm not sure she saw anyone else in that clinic. I think there was one other doctor she saw, but I would have to look that up real quickly. What was his role with the Meniere's disease? Well, his role is he wasn't a specialist in it, so he didn't know. He deferred, I think, to Dr. Palaskis to look at it because Dr. Palaskis was a specialist. I would like to reserve the balance of my time. That's fine. Thank you. Okay, and now for appellee. Is that Mr. Langhammer? I can't quite read him. That's correct, Your Honor. Thank you. May it please the Court, my name is Joseph Langhammer. I represent the Commissioner in this case. Ms. Herter claimed that she couldn't work for a variety of reasons. For example, she said that she couldn't work because she had problems breathing. But in March 2007, pulmonary function tests were normal, and she had various examinations throughout 2011 and 2012 that showed that her lungs were clear. She also alleged that she had pain in her knee, her back, and her shoulder. Yet in December 2010, for example, after the date she claimed that she became disabled, she said she actually didn't use pain meds and she preferred to just deal with it. And she repeatedly felt well, as she reported to her various providers. And finally, despite claiming that she experienced dizziness and ringing in her ears, conditions that she attributed to Meniere's disease, exams repeatedly showed that she had essentially unremarkable examinations. And one provider actually questioned whether or not she even had Meniere's disease, given the lack of physical findings here. Who was that? I can point your honor to the page. I believe it's on page 903. The record states that her subjective complaints of dizziness were unconfirmed by physical findings. Which doctor is that? That was my question. Is that Dr. Ekema? Because that comes right after Dr. Ekema's certification, or whatever this is. It may be, your honor. I need to actually turn to the page to just double check. And do you dispute Dr. Palaskis' diagnosis? The ALJ discounted certain aspects of Dr. Palaskis', not necessarily the diagnosis, but certain aspects of Dr. Palaskis' opinion. There's no question, but that he diagnosed her with Meniere's disease, correct? There's no question that she has that diagnosis. I think that the point is, though, that with respect to the severity of her symptoms from that disease, the ALJ provided valid reasons why those symptoms were not disabling. Specifically with respect to Dr. Palaskis, he said that she had frequent Meniere's attacks and he actually called her symptoms debilitating. Medical records contradict that. If we look at pages within the medical records, specifically page 903, I would point your honor to, that's in February 2012. That's the same month that Dr. Palaskis issued one of his opinions. And what that medical note says is that her subjective dizziness complaints were, quote unquote, unconfirmed by physical findings. She could perform all of her postural movements at that point. If we look at notes from April 2009, for example, going back in time, page 875, only reduced vestibular response. One of the things that she complained about was hearing problems and balance problems. In May of that year, she reported having few, if any, severe vertigo episodes. And there on page 874 to 875, we have another medical provider questioning the diagnosis. So while it's... Which medical provider was that? Just give me one moment, your honor. I'm turning to that page so that I can... So this was from Ear, Nose, Throat and Plastic Surgery Associates. It's Mary Seward. And that's, again, and then on the other... Was she an examining physician or was she a treating physician? She was treating. So the ear, nose and throat, these records are treating. And here, in fact, if we look at... And then over on 875, Dr. Palaskis is on that page. So he's associated with that practice as well. So these are... Before you leave 903, following the part you read, this is a section called Impression, DSHHS Evaluation, Dizziness, HX of Meniere's Disease. What does that mean? That means that the Department of Social and Health Services, apparently, Dr. Enkema is referring to that evaluation. And that the impression is that she has dizziness and that there is a history of Meniere's Disease in the record. And I don't think there's any dispute here about that. I think, to your Honor's point, that impression states that she does have the disease. However, when we look at what the neurological findings are right above that, which is part of the physical examination... Yes, but that's one... That's just one episode of the examination. And Meniere's Disease is episodic by definition, isn't it? In terms of the symptoms and balance. Correct, and to the extent that... And I think it's important to note that the ALJ didn't reject the notion that she had Meniere's Disease or that she even experienced dizziness from time to time. What we have here is an ALJ limiting her to a range of light work with various postural limitations and environmental limitations if you look at the ALJ's actual RFC. So the ALJ isn't saying, this person doesn't experience dizziness, this person doesn't have any restrictions working. What the ALJ is doing is looking at the longitudinal record. This treatment note is, as your Honor points out correctly, one of those treatment records. And what that record showed, as the ALJ reasonably found, was that her symptoms were not as debilitating as she claimed. Dizziness being one symptom that she focused on. Ms. Herter, in addition to Dr. Pulaski's opinion, I wanted to touch on a few other opinions that Ms. Herter addressed today. Dr. Enkema was an opinion that her counsel focused on. Dr. Enkema limited Herter to sedentary work, which is the lowest form of work under Social But there are two reasons that the ALJ provided for discounting that opinion. Number one, it was inconsistent with that doctor's own findings, regardless of whether or not Dr. Enkema was an examining physician or whether or not he treated, he actually saw her more than one time, the ALJ provided valid reasons for discounting it. And with respect to the doctor's other findings that were inconsistent with the notion that she was limited to sedentary work, for example, on page 899, Dr. Enkema actually rated her balance as quote unquote mildly deficient. Again, this gets to your Honor's point about the longitudinal record and how severe her dizziness was. This is a doctor who is saying that she has a mildly deficient balance. In addition, he found that her back problems and her vertigo were moderate. That does not line up with his opinion that somebody, that this individual could perform only sedentary work. And in addition... Well, wait a minute. Counsel, he's saying the balance is variable, but it is the balance, I assume, unreliable and mildly deficient. So that's a factor that goes into his evaluation, that it is unreliable. Her balance is unreliable, right? Correct. The point being, though, Your Honor, one of the things that an ALJ may look at under this is a doctor's ultimate opinion, in this case sedentary work, which is what Dr. Enkema said, is actually consistent with what the medical findings are. That's part of the ALJ's role here in assessing the entire record. And here, when we have findings from a doctor that a claimant's balance is only mildly deficient, it's reasonable for the ALJ to look at that finding and say, that doesn't line up with an opinion that this person can't lift more than 10 pounds or needs to sit for the vast majority of the day. And with respect to, Your Honor pointed out that the exam was less definitive than I would expect for Meniere's disease. That further underscores the ALJ's decision in this case to give less weight to that opinion because even Dr. Enkema noted that the exam was not all that definitive. And he recommended that she be re-evaluated in three weeks. So we don't have an opinion here that's offering any strong support for her claim that she was disabled given her balance issues. Well, you know, he had noted that her Meniere's disease had started about three years ago from the date that he wrote this report. I think that was Dr. Palaskis, perhaps it was Dr. Enkema as well. Dr. Enkema's, I got it right here. Okay. It says, date of onset of primary impairment, Meniere's disease started three years, Meniere's started three years ago. You know, the exchange he had with Judge Fisher over balance is variable but unreliable. Preceding that is a whole, he checks a number of boxes, check any of the following areas that has restricted mobility, agility, or flexibility. He checks balancing, bending, climbing, crouching, kneeling, pulling, pushing, reaching, stooping. Check sitting. Correct. He does check boxes with, your honor is referring to the top of the. And then he says, as Judge Fisher pointed out, balance is variable but unreliable and mildly deficient. And the key there is. And then he concludes, using the definitions below, what is the client's overall work level, sedentary. And the key there, your honor, is that there are really two points that the ALJ relied on here. The key is, the mildly deficient finding there, as well as when we look at what the severity rating is, he didn't rate the severity of her balance problems as marked or severe, which would be more in line with his opinion that she could perform sedentary work. He marked three, which was moderate. And then when he talked about her balance being variable, he added, despite the fact that it was unreliable, it was also just mildly deficient. So the ALJ looked at all of these findings and drew the reasonable determination that there were some inconsistencies here that warranted giving this opinion less weight. With respect to, I believe that Herter's counsel also mentioned the RFC finding in this case being similar to, the same as the prior determination, and argued that the ALJ didn't basically reevaluate the RFC. When the court looks at what the ALJ actually did here, it's clear that the ALJ was honoring this court's prior determination that the medical records that were before the court supported an RFC for a range of light work, and that the medical evidence that was submitted on remand didn't justify a basis for changing that. And that's clear. If you were to credit Dr. Nomicka's, what was it, Dr. Nikma, his opinion, what is that, what would be the result? The counsel, Herter's counsel argues that it would be, if you were to credit it, that it would result in sedentary work, and therefore under the grids, that she would be disabled. I think that under the medical guidelines, that's what would occur. However, what's important to note is that there are various instances here that this is not a case that would be ripe for a credit as true, in other words, just crediting this opinion and then sending it back for a finding of disability, because there are various medical opinions in this case that, including cases from the prior record that this court affirmed, that demonstrate that Ms. Herter is not as limited as Dr. Nikma suggests. And there are medical findings throughout the record, again, various normal findings that we cite in our brief that demonstrate that there really is a conflict here. So this would not be an instance that Let me ask you this. To the extent, so she's only seeking benefits now back to 2008, is that correct, because of the prior proceedings? My understanding is that's the point that, that is what Herter is representing, is that that prior decision is essentially affirmed and therefore is law of the case. So the relevant inquiry would be from 2008 onward. The prior application was actually submitted in 2006. So to what extent can you, given the addition of new medical evidence and whatnot, to what extent can you look at the prior records? The court is entitled For historical purposes? Absolutely. I mean, the court is entitled to look at this entire record. And I think the point is, though, that this court has already looked at that record and has already said that the ALJ's findings with respect to those records were supported by substantial evidence. The court's not entitled, is not required to look at these new records in a vacuum, of course. But what the ALJ did was to give, obviously, honor this court's prior determination and then just applied the step five issue that was at issue on remand and then looked at the additional records to see if there was any need to change the RFC. And I see that my time is up. If Your Honor, if Your Honors have no further questions, I would request that the court affirm the ALJ's decision in this case. Thank you. Unless there are questions from Judge Fischer or Judge Papias? No. Okay, great. Thank you very much for your argument. Now we have Mr. Janich again to give us his rebuttal argument. Let me start by addressing Judge Papias' question, your comment about the other doctors. He saw Dr. Majorca there once, the only other medical doctor that he appears, she appears to have seen at that clinic. But it was a clinic and there were nurses that treated her. There were about four or five treatment notes from that place. So he was a treating physician. That's unquestioned, unquestionable. Now with regard to Dr. Enkema's opinion and the idea that it's such an extreme opinion, this is a woman, one of the things he noted in his evaluation is that she has dwarfism deformities. That's who she is. She was born with these odd deformities which affect her at her age there. When he was seeing her, she was I think over, right around 55. But Dr. Enkema didn't say anything real radical here. He didn't say she can't do anything. He said she'd have to be limited to sedentary work, stay off her feet because being on her feet is not such a good idea if you can't keep your balance. That's sort of what that boils down to. There is no valid reason for rejecting Dr. Palaskis' opinion. He's a treating physician. He's a specialist. And his opinion was she's got Meniere's disease and it can cause these exacerbations. There's no opinion evidence in the record from September of 2008 on of anyone actually saying she could do light work. And in fact, prior to that, pretty much all the evidence also says she can't do light work, but that got rejected by the ALJ the first time around. Doesn't ALJ have to make a new decision, a new RFC? His RFC here, his residual functional capacity assessment, didn't change one whit, didn't change at all. And the only way to justify that is by rejecting the psychological evaluation by Dr. Wingate, the evidence from Ms. Niemietz, the evaluation from Dr. Enkema, and the evaluation from Dr. Palaskis. If you reject all of the evidence from every treating and examining physician, guess what? There's nothing left. But essentially from the time period of 2008 on, that evidence is uncontradicted. His reasons for rejecting all that evidence needed to be convincing, not just, well, I don't like it, or it wasn't specific enough for my taste, or Dr. Palaskis, one of the I would ask that for the time period that this Court, I don't have any problem and I think it's reasonable for this Court to affirm the ALJ's decision. I don't think we have grounds to challenge it through the date of the previous, his previous decision. But since then, she turned 50, and all the evidence shows she's limited to sedentary work. So it does support a finding of What's her age today? Oh, my God. 59, I believe. This is going on forever. So really, from age 50, the evidence shows she was limited to sedentary work, and she does grid out at sedentary. Thank you. Thank you. Thank you. I want to thank both counsel for their fine arguments. And the order of case shall be submitted.
judges: Fisher, Gould, Paez